UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DENNIS P. LAMBOY,

         Plaintiff,

-against-

COMMISSIONER OF SOCIAL SECURITY,

         Defendant.

**OPINION AND ORDER**

16 Civ. 1197 (ER)

Ramos, D.J.:

  Dennis P. Lamboy ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) challenging the decision of the Commissioner of Social Security ("Commissioner") to deny his application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Pending before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

  For the reasons stated herein, Plaintiff's cross-motion is GRANTED to the extent it seeks remand and the Commissioner's cross-motion is DENIED. Accordingly, the case is remanded to the Commissioner for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Plaintiff's Background

  Plaintiff was born on July 2, 1952. Tr. at 247. Upon turning eighteen, Plaintiff enlisted in the Navy, where he served in Vietnam, and received two Bronze Stars for his service. Tr. at 247, 421. He was honorably discharged in May 1972. Tr. at 247. That year he obtained a general equivalency diploma ("GED") and subsequently completed two years of college. Tr. at 48, 226, 246–47. From 1992-2011, Plaintiff worked as an admissions representative for various

schools and colleges. Tr. at 216, 226, 248. These jobs entailed recruiting and interviewing students and also assisting students with financial aid and employment. Tr. at 16, 249. Plaintiff was laid off by his employer on March 20, 2011. Tr. at 36. For six weeks, from August to September 2012, Plaintiff worked as a temporary admissions officer. Tr. at 36–37.

**B. Plaintiff's Medical History and the Administrative Record**

Plaintiff claims that he became disabled on March 20, 2011, due to anxiety, depression, post-traumatic stress disorder ("PTSD"), vitiligo, heart disease, and hand tremors. Tr. at 54. He further claims that he had trouble focusing, was forgetful and sometimes got lost walking, and had difficulties writing and using his hands because of tremors. Tr. at 234–243. Plaintiff also suffered from flashbacks of a friend who committed suicide while serving in the Navy. Tr. at 242. These symptoms were managed through a variety of prescription medication, including Trazadone for insomnia, Sertraline (Zoloft) for anxiety, and Propranolol for his hand tremors. Tr. at 235, 242–43.

Although the alleged onset date is March 20, 2011, the administrative record is devoid of any medical history from March 20, 2011 to December 5, 2012. *See* Tr. 302 (noting gaps in medical record from 3/11 to 12/12). Additionally, the record consists of 1005 pages, however, a significant majority are duplicative records of the consultations Plaintiff had between December 5, 2012 and May 28, 2014.

According to Plaintiff's medical records,[1] on December 6, 2012, Plaintiff went to the Miami Veterans Administration Hospital ("Miami VA") after losing his residence. Plaintiff

---

[1] The administrative record also includes medical records from 2005 to 2011, before the alleged onset date. For example, in 2005, Plaintiff sought help at the Miami Veterans Hospital for PTSD and depression. Tr. at 496–99. He was unemployed and homeless at this time and claimed that he began having physical and emotional problems, which made it hard to function. Tr. at 504. Plaintiff acknowledged that he drank daily and also used drugs. Tr. at 505. During this time, Plaintiff was also seen in the dermatology clinic, where he was prescribed a skin ointment to treat his vitiligo. Tr. at 494–95.

2

reported that he had recently moved to Miami from Colorado and that he suffered from depression and PTSD. Tr. at 429, 433. Plaintiff met with psychiatric resident Dr. Lance Amols, who evaluated him. Plaintiff told him that he suffered from insomnia, loss of appetite, decreased energy, decreased concentration, and crying episodes. Tr. at 430. Dr. Amols performed a mental assessment and noted that Plaintiff's eye contact was "fair," his motor function was within normal limits, his speech was "clear and coherent," and that his thought processes were "organized, linear, [and] goal oriented." Tr. at 431. Dr. Amols diagnosed Plaintiff with major depressive disorder and moderate and recurrent PTSD. *Id.* He also assigned Plaintiff a global assessment functioning ("GAF")[2] score of 55, which indicates that he has "moderate symptoms" or "moderate difficulty in social occupational, or social functioning." *Id.*

On December 10, 2012, Plaintiff returned to Miami VA complaining of depression and anxiety. Dr. Alexander Perez, a psychiatrist, evaluated him and found that he was suffering from major depressive disorder and moderate and recurrent anxiety disorder. Tr. at 421. Dr. Perez noted that Plaintiff was experiencing anxiety, hyperarousal, irritability, intrusive thoughts, emotional detachment, poor concentration, and poor/fragmented sleep. *Id.* Dr. Perez's notes indicate that Plaintiff's cognitive functioning was "grossly intact" and that his thought processes were "logical." He also described the efficacy of Plaintiff's prescription medication as "partial"

---

[2] The GAF scale was used in the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") and reports an individual's "psychological, social, and occupational functioning" and was viewed as "particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., text rev. 2000). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34 A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."). The GAF scale was not included in the most current edition of the DSM. *See Diagnostic and Statistical Manual of Mental Disorders* 32 (5th ed., 2013).

and increased his medication, and provided supportive therapy. *Id.* at 422. Dr. Perez also gave Plaintiff a GAF score of 55.

On December 20, 2012, Plaintiff met with Doctor Samuel Neuhut, a psychiatric resident, who also diagnosed Plaintiff with major depressive disorder and moderate PTSD. Tr. at 396. Plaintiff told Dr. Neuhut that he experienced insomnia, despite taking medication, and anxiety. Tr. at 397. With respect to Plaintiff's mental status, Dr. Neuhut reported that he was cooperative and had good eye contact. Plaintiff's speech was clear and his concentration and judgment were "fair." *Id.* Dr. Neuhut determined that his GAF score was 55 and switched Plaintiff's medications to Sertraline and Trazodone. Tr. at 398.

On February 7, 2013, Plaintiff went to Miami VA after he lost consciousness while standing in front of the Salvation Army, where he was staying. Tr. at 328. He was admitted and stayed overnight. Plaintiff explained to the medical staff that he had not been adequately eating or drinking, who concluded that the episode was most likely due to dehydration and tachycardia from amphetamine use. Tr. at 356. Plaintiff was also found to be at a moderate risk for falling. Tr. at 343. Plaintiff was discharged, but because he was homeless, a social worker was called to help him find immediate placement. Tr. at 341. The social worker arranged for Plaintiff to take a bus to New York, where he would stay with his sister. Tr. at 335.

On April 22, 2013, Plaintiff went to Hudson Valley Hospital ("Hudson Valley") in New York for an initial evaluation. Tr. at 844. He was evaluated by Dr. Mukta Samir Sharma. Plaintiff reported that he was feeling "great" and requested to see a dermatologist for his vitiligo and a specialist for his hand tremors. Tr. at 835. He further claimed that Trazadone did not help his insomnia and that he had not taken Sertraline in the previous four weeks. *Id.* After a physical examination, Dr. Sharma noted that Plaintiff was alert and that his speech and affect

4

were appropriate. Tr. at 846. Dr. Sharma referred Plaintiff to the mental health, dermatology, and neurology clinics. Tr. at 847.

Two days later, on April 24, Plaintiff met with Dr. Alexandra Berger, a staff psychiatrist. Tr. at 812. He told Dr. Berger that he was having nightmares, had poor sleep, and auditory hallucinations in the form of hearing "people's conversations." *Id.* Plaintiff denied any suicidal ideations and admitted to drinking three-to-four beers occasionally. *Id.* Dr. Berger noted that Plaintiff's thought processes were logical and goal oriented and that his speech was normal. *Id.* She also scheduled Plaintiff for a full mental health evaluation.

On May 21, 2013, Plaintiff was seen at the dermatology, neurology, and psychiatric clinics. Plaintiff met with a dermatologist who prescribed him skin ointment to help with his vitiligo. Tr. at 758–60, 772. He next met with Dr. Seshura Kruthiventi, in neurology, to address his hand tremors. Tr. at 776. Plaintiff claimed that due to the tremors, he was having trouble performing his daily activities. *Id.* Dr. Kruthiventi determined that the tremors were related to his alcohol withdrawal. He prescribed Plaintiff Propranolol and advised him about the further risks of alcohol consumption. Tr. at 778. Plaintiff also met with Dr. Berger for a psychiatric evaluation and a suicide assessment. Plaintiff told her that although he was not feeling depressed at the time of the visit, he was experiencing stress and occasional anxiety and hand tremors. Dr. Berger noted that he had no suicidal ideations and did not complain of severe emotional distress, anxiety, or panic symptoms that day. Tr. at 779–779. He also appeared calm and cooperative, had a mild left hand tremor, and a linear thought process. Tr. at 783. Dr. Berger assigned him a GAF score of 65, indicating that he had some "mild symptoms." Tr. at 767, 783.

Plaintiff returned to the hospital for a follow up examination with Dr. Berger on June 19, 2013. He reported experiencing depression, lack of focus, memory loss, anxiety, insomnia, and nightmares. Tr. at 765. He also claimed that he was feeling better since taking the prescribed

5

medication, but still experienced lack of focus and occasional nightmares. Tr. at 765. Dr. Berger noted that his memory was "grossly intact" and that he was attentive and appeared to be in a good mood. Based on Plaintiff's symptoms and her assessment, Dr. Berger diagnosed Plaintiff with depression/anxiety disorder, major depressive disorder, PTSD, and polysubstance abuse. Tr. at 767. She increased his Sertraline and Trazadone dosage and provided supportive counseling. Dr. Berger assigned him a GAF score of 65. *Id.*

Plaintiff met with Dr. Berger again on July 31, 2013. He told her that he needed to refill his prescriptions because the Sertraline was helping him with his anxiety and the Trazodone helped him sleep. Tr. at 818. However, he denied feeling less depressed on the medication. *Id.* Dr. Berger found Plaintiff's memory to be "grossly intact" and his mood/affect as "euthymic/full range." *Id.* She concluded that he was fairly stable on his prescribed medication regimen and referred him to Dr. Iva Lesniak for further evaluation. Tr. at 820.

Plaintiff met with Dr. Lesniak on August 30, 2013 and attended follow-up meetings with her approximately every two months. At the first meeting in August, Plaintiff complained of anxiety and depression, but again noted that his medications helped address his anxiety and insomnia. Tr. at 866. He also reported to have memory problems and problems concentrating. *Id.* He explained to Dr. Lesniak that he lost his job because he could not focus and because of his hand tremors, which made it difficult for him to write. Tr. at 868. Dr. Lesniak assigned him a lower GAF score of 55. She also advised Plaintiff to cease alcohol consumption. Tr. at 869.

The next follow-up meeting was on October 23, 2013. Plaintiff reported that he was feeling better but that he was still experiencing hand tremors. Tr. at 952. He also claimed to have heard a voice telling him to harm himself, but denied having any paranoid ideations. Tr. at 953. Dr. Lesniak noted that there was conflicting information in Plaintiff's chart regarding the friend's suicide. Plaintiff had previously reported that his friend died while in combat, but that

6

day, Plaintiff denied being in combat. Tr. at 953. Dr. Lesniak increased Plaintiff's dosage of Sertraline and advised Plaintiff to contact his primary care physician regarding his poor concentration, depression, and memory problems. Tr. at 955.

Plaintiff met with Dr. Lesniak again on November 20, 2013. He reported that he felt a slight improvement in his symptoms and that his depression was a "7/10." Tr. at 945. He also reported having had visions, but no suicidal ideations. *Id.* Dr. Lesniak again increased his Sertraline intake and suggested that he see his primary care physician or a neurologist to address the visions. *Id.* at 948. He also assigned Plaintiff a GAF score of 55. Tr. at 949. At the January 15, 2014 follow-up, Plaintiff reported feeling better—feeling less depressed and anxious—since they increased his Sertraline dosage. Tr. at 940. He also stated that he had been arguing with his sister and described it as a chronic stressor. *Id.* Dr. Lesniak provided helpful coping mechanisms and suggested that Plaintiff return for an evaluation in two months. Plaintiff returned on March 28, 2014 and reported feeling better, but still claimed to have trouble focusing and multitasking. Tr. at 934. He also claimed to forget where he placed things. Tr. at 935. Dr. Lesniak concluded that Plaintiff was not an imminent danger to himself or others and that he was not psychiatrically unstable. Tr. at 935. After reviewing his medication regimen, Dr. Lesniak advised Plaintiff to return in two months. Tr. at 938. At his evaluation on May 28, 2014—the last one in the administrative record—Plaintiff reported feeling depressed four times a month and having mild anxiety. Tr. at 928. He also said that he had started hearing a voice, but denied having any hallucinations. Dr. Lesniak increased Plaintiff's dosage of Sertraline and discussed the potential of adding medications to his regimen. Tr. at 931. Dr. Lesniak again assigned Plaintiff a GAF score of 55. The administrative record contains no assessments as to Plaintiff's mental ability or capacity to perform tasks.

In addition to Plaintiff's medical records, the administrative record also includes a letter from Theo Gibbings, Plaintiff's friend and an employee from a school in which Plaintiff previously worked. Tr. at 888. Mr. Gibbings first met Plaintiff in June 2005 when he applied for a job as an admissions representative. In the letter, Mr. Gibbings explained that Plaintiff appeared to be getting worse—he often lost his balance, his hands would shake, and at times cried uncontrollably. He also claimed that Plaintiff showed signs of "greater depression." *Id.*

### C. Plaintiff's Application for Disability Benefits

Plaintiff applied for DBI and SSI in April 2013, alleging disability as of March 20, 2011. Tr. at 177, 186. By Notice of Disapproved Claim dated September 24, 2013, the SSA denied Plaintiff's claim. Tr. at 89–103. Plaintiff requested a hearing before an administrative law judge ("ALJ") and on July 16, 2014 appeared at a hearing before ALJ Denis Katz. Tr. 33–53. In a decision dated September 2, 2014, the ALJ denied Plaintiff's claim, concluding that he was not disabled. Tr. at 15–32.

An individual is considered "disabled" under the Social Security Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to determine whether an individual is disabled, the Commissioner follows a five-step sequential evaluation process set out in 20 C.F.R. § 404.1520. "If at any step a finding of disability or nondisability can be made, the [Social Security Administration] will not review the claim further." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

At step one, the Commissioner determines whether the individual is engaged in any "substantial gainful activity;" if he is, he is not disabled. 20 C.F.R. § 404.1520(a)(4)(i), (b). At step two, the Commissioner determines whether the individual has a "severe impairment" that

"significantly limits [his] physical or mental ability to do basic work activities;" if he does not, he is not disabled. *Id.* § 404.1520(c), (a)(4)(ii). At step three, the Commissioner determines whether the individual has an impairment that meets or equals one of those listed in Appendix 1; if he does, he is disabled. *Id.* § 404.1520(a)(4)(iii), (d). If he does not, the Commissioner will assess and make a finding about the individual's residual functioning capacity ("RFC")—or "the most [he] can still do despite [his] limitations"—based on all the relevant medical and other evidence in his case record. *Id.* §§ 404.1520(e), 404.1545(a)(1). At step four, the Commissioner determines whether, considering his RFC, the individual can still do his past relevant work; if he can, he is not disabled. *Id.* § 404.1520(a)(4)(iv), (f). Finally, at step five, the Commissioner determines whether, considering his RFC, age, education, and work experience, the individual can make adjustment to other work; if he cannot make adjustment to other work, he is disabled, and if he can, he is not. *Id.* § 404.1520(a)(4)(v), (g).

Here, the ALJ found that: (1) Plaintiff met the insured status requirements of the Social Security Act; (2) Plaintiff had not engaged in substantial gainful activity since March 20, 2011, the alleged disability onset date; (3) Plaintiff had severe impairments, including posttraumatic stress disorder, depression, and alcohol/polysubstance abuse in remission; (4) Plaintiff's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"); (5) Plaintiff has the RFC to perform a full range of work at all exertional levels but is limited to the performance of basic unskilled work tasks in that he can understand, remember and carry out short/simple instructions and perform, routine, repetitive work but cannot perform highly complex work with which he is not familiar; (6) Plaintiff is capable of performing past relevant work as an admissions counselor; (7) Plaintiff was 60 years old on the disability onset date; (8) Plaintiff has at least a high school education and is able to communicate in English; (9) the transferability of job skills was not

9

material to the determination of disability because Plaintiff is not disabled; and (10) considering Plaintiff's age, education, work experience, and RFC, there are other jobs that exist that he can perform. Tr. at 20–26.

In determining Plaintiff's RFC, the ALJ first considered Plaintiff's hearing testimony. At the hearing, Plaintiff testified that he worked as an admissions officer for a period of six weeks from August to September 2012—significantly after his alleged onset date of March 20, 2011. Tr. at 36–37. Plaintiff further explained that he was fired in March 2011 because his employer saw that he could no longer perform the tasks required for his position. Tr. at 38. He also informed the ALJ that his hand tremors hindered his ability to write. Tr. at 39. When the ALJ asked Plaintiff how his mental illness affected his ability to work as an admissions representative, he responded by providing the example of how he became lost one block away from the Salvation Army where he was staying. Tr. at 40. He said that he could not find his way back and became very anxious, upset, and frustrated. *Id.* When Plaintiff's counsel asked him to further elaborate, Plaintiff explained that he no longer had control of his faculties. Tr. at 45. Specifically, he said that he could no longer type or write reports and that his bouts of anxiety and loss of concentration would also significantly interfere with his ability to work as an admissions officer. *Id.*

The ALJ also noted that Plaintiff had applied for unemployment insurance benefits through the New York State Department of Labor ("DOL") representing to the DOL that he was able to and actively looking for work. Tr. at 22. The ALJ found that Plaintiff's representations to the DOL were inconsistent with those in his application to the Social Security Administration and thus concluded that Plaintiff "was not a totally reliable witness." Tr. at 23. The ALJ further noted that Plaintiff testified that he had a history of alcohol abuse but had not consumed alcohol in the three years preceding the petition and that he suffered from long-term depression but was

nevertheless capable of working until he was laid off. *Id.* Plaintiff also testified that he took psychotropic medications to control his depressive symptoms, has no physical problems, and has continued to apply for work. *Id.*

The ALJ also relied on Dr. Berger's medical notes from Plaintiff's care at Hudson Valley. Dr. Berger noted a history of combat trauma, PTSD and complaints of nightmares, poor sleep, and auditory hallucinations. *Id.* As of July 31, 2013, Dr. Berger noted that Plaintiff was "fairly stable" and "was not suicidal." *Id.* The ALJ noted that Plaintiff was given supportive therapy and his prescriptions for Sertraline and Trazodone were continued. He found that the psychotropic medication was "adequately control[ing] his psychiatric symptoms." *Id.*

The ALJ also considered Dr. Lesniak's medical notes. As of August 30, 2013, Dr. Lesniak made similar observations to Dr. Berger and also noted that Plaintiff's prescribed Sertraline had considerably decreased his anxiety and that the Trazodone helped him sleep. *Id.* Dr. Lesniak also noted that Plaintiff's thought processes appeared intact and there was no evidence of delusions, hallucinations, suicidal or higher homicidal ideation. *Id.* The ALJ highlighted that Plaintiff informed Dr. Lesniak that he was drinking six to ten drinks once every two weeks—which greatly differed from his testimony at the hearing. Tr. at 24. The ALJ then listed Plaintiff's subsequent sessions with Dr. Lesniak, in which he complained of difficulty sleeping, depression, and periodical passive suicidal ideation. *Id.* Dr. Lesniak assigned Plaintiff a GAF score of 55, which the ALJ acknowledged was "indicative of moderate symptoms." *Id.* By May 20, 2014, Plaintiff complained of bouts of depression approximately four times of month, periodic anxiety, auditory hallucinations, and periodic suicidal feelings. *Id.*

Based on a review of the evidence, the ALJ found that Plaintiff's medically determinable impairments "could reasonably be expected to cause some of the alleged symptoms." *Id.* However, he found that Plaintiff's claims as to the intensity, persistence, and limiting effects of

11

the symptoms were not supported by the medical record. *Id.* The ALJ noted that although Plaintiff claimed he had a history of depression, PTSD, and periodic alcohol abuse, none of these factors prevented him from maintaining employment. *Id.* Further, the ALJ also found that his conditions could be controlled by medication and that there was no evidence of any cognitive deficit therefrom. *Id.* The ALJ concluded that the likelihood that Plaintiff would suffer from deficits in concentration due to his medical conditions did not preclude him from being able to perform unskilled work tasks. Tr. at 25. The ALJ stated that his decision was consistent with the notes from Hudson Valley, which showed that Plaintiff's mental condition "was not at such severity for any 12 month period of time during which his mental condition was not stable." *Id.*

The ALJ also solicited the testimony of Linda Stein, a vocational expert, to help assess the complexity and exertion level of Plaintiff's past employment. Stein classified Plaintiff's admissions counselor position in three ways: first, as admissions counselor, and claimed that the position had an SVP[3] level of 5; second, as financial aid counselor, also with an SVP of 5; and third, as student placement service, which has an SVP of 8. Tr. at 50. In response to the ALJ's question regarding the intellectual demands of these positions, Stein explained that the positions were considered "highly skilled," the intellectually reasoning "would be considered high," as well as math and language. Tr. at 51. Stein further clarified that the position was intellectually demanding and required executive decision making and functioning. *Id.* She, however, did not testify as to Plaintiff's ability to perform those tasks. Upon consideration of the administrative

---

[3] "SVP" stands for "specific vocational preparation," and refers to the amount of time it takes an individual to learn to do a particular job. Jeffrey Scott Wolfe & Lisa B. Proszek, *Social Security Disability and the Legal Profession* 163 (2002). SVP uses a scale from 1 to 9 and the higher the SVP number the greater the skill required to do the job. *Id*; *see also Urena-Perez v. Astrue*, No. 06 Civ. 2589 (JGK) (MHD), 2009 WL 1726217, at *40 (S.D.N.Y. Jan. 6, 2009), *report and recommendation adopted as modified*, No. 06 Civ. 2589 (JGK), 2009 WL 1726212 (S.D.N.Y. June 18, 2009).

record and the testimony at the hearing, the ALJ held that Plaintiff was not disabled under Sections 216(i), 223(d), and 1614(a)(3)(A), and was thus not entitled to receive DIB or SSI.

Plaintiff asked the Appeals Council to review the ALJ's decision. Tr. at 12–13. On December 10, 2015, Plaintiff's request was denied, rendering the ALJ's decision the final decision of the Commissioner in his case. Tr. at 1–4. On February 16, 2016, Plaintiff appealed the decision by filing the Complaint in this action. No. 16 Civ. 1197 (ER), Doc. 1. The parties thereafter cross-moved for judgment on the pleadings. *See* Docs. 21, 27.

## II. STANDARD OF REVIEW

Section 405(g) allows an individual to obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). "In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted).

To determine whether substantial evidence exists to support the Commissioner's final decision, the reviewing court must consider the whole record, weighing the evidence on both sides of the question to ensure that the claim has been fairly evaluated. *Calzada v. Asture*, 753 F. Supp. 2d 250, 268 (S.D.N.Y. 2010) (internal quotations omitted); *see also Selian*, 708 F.3d at 417 ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). Upon review, the district court may "enter, upon the pleadings and transcript of the record, a judgment affirming,

modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## III. DISCUSSION

### A. Development of the Medical Record

#### i. Duty to Develop

Plaintiff's sole challenge to the ALJ's decision is that he failed to adequately develop the medical record by not requesting medical reports from any treating or consultative physicians or psychiatrists. Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Memo") (Doc. 22) at 11. Specifically, Plaintiff asserts that the ALJ was obligated to make some effort to secure a medical opinion from Dr. Lesniak, his treating physician. Plaintiff claims that he provided Dr. Lesniak's contact information, but the ALJ made no efforts to contact her. *Id.* Thus, because the record lacks any medical reports or opinions the ALJ had no adequate basis to assess the degree of Plaintiff's RFC. *Id.* In response, the Commissioner concedes that the ALJ failed to request a medical opinion as required by statute, but argues the ALJ committed harmless error because the record was sufficient to support his finding. Memorandum of Law in Support of Defendant's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings ("Def. Memo") (Doc. 28) at 17–24.

It is the well-established rule in our circuit that the ALJ in social security cases, unlike a judge in a trial, must on behalf of all claimants—even those represented by counsel—"affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009)). Specifically, the ALJ is required to develop a claimant's complete medical history. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20

14

C.F.R. §§ 404.1512(d)–(f)); *see also* 42 U.S.C.A. § 423 ("In making any determination the Commissioner . . . shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination."). The ALJ's duty to develop the administrative record "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07 Civ. 11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008).

Whether the ALJ has met his duty to develop the record is a threshold question. Before a court can determine whether the Commissioner's final decision is supported by substantial evidence under Section 405(g), "the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record." *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 261 (S.D.N.Y. 2016) (internal quotations omitted). "Where the ALJ has failed to develop the record adequately, remand to the Commissioner for further development is appropriate." *Norman v. Astrue*, 912 F. Supp. 2d 33, 74 (S.D.N.Y. 2012); *see, e.g.*, *Moran,* 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

ii. **Determining RFC**

The RFC assessment is an ALJ's finding of "the most [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a). An ALJ considers medical source statements and all other evidence in the case record in making an RFC finding. *Id.* ("[The ALJ] will assess your residual functional capacity based on all the relevant evidence in your case record."); SSR 96-5p, 1996 WL 374183 (July 2, 1996). "A medical source statement is an evaluation from a treating

15

physician or consultative examiner of what an individual can still do despite a severe impairment, in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." *Hooper v. Colvin*, 199 F. Supp. 3d 796, 812 (S.D.N.Y. 2016) (internal quotation marks omitted). Because of the special evidentiary weight given to the opinion of the treating physician, the ALJ must "make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of the treating physician as to the existence, the nature, and the severity of the claimed disability." *Molina v. Barnhart*, No. 04 Civ. 3201, 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005) (internal quotation marks omitted).

Nevertheless, in non-precedential opinions, the Second Circuit has suggested that an ALJ's failure to obtain a medical source statement from a treating physician before making a disability determination may not necessarily require a remand. *See Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013). The Circuit recommended that the determination that an administrative record is incomplete without a medical source statement be made on a case-by-case basis, depending on the "circumstances of the particular case, the comprehensiveness of the administrative record," and "whether . . . [the record,] although lacking the opinion of [the] treating physician, was sufficiently comprehensive to permit an informed finding by the ALJ." *Sanchez v. Colvin*, No. 13 Civ. 6303 (PAE), 2015 WL 736102, at *5–6 (S.D.N.Y. Feb. 20, 2015) (citing *Tankisi*, 521 F. App'x. at 33–34). For an ALJ to make a disability determination without seeking any treating physician opinion, there must be "no obvious gaps in the administrative record," and the ALJ must "[possess] a 'complete medical history.'" *Rosa v. Callahan*, 168 F.3d 72, 83 n.5 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)).

### iii. Analysis of the ALJ's Decision

The Court finds that the ALJ failed to fully develop the evidentiary record given the lack of medical opinion evidence regarding Plaintiff's functional limitations caused by his mental impairments. Accordingly, the Court cannot conclude that the ALJ evaluated Plaintiff based on a complete record. *See Hooper*, 199 F. Supp. 3d at 806 (finding that ALJ failed to obtain comprehensive assessments from treating or consultative physicians of plaintiff's mental impairments and remanding case).

First, the medical record here is far from complete. The administrative record is devoid of any medical notes, assessments, and testimony from March 20, 2011—the alleged onset date—to December 6, 2012. Significantly, the administrative record also does not include a single treating or consultative physician's medical source statement. *See* Tr. at 73 (noting in initial disability claim that "no indication that there is opinion evidence from any source"). Additionally, the medical notes in the record do not contain any statements regarding Plaintiff's capacity to engage in tasks or activities. Instead, the doctors who evaluated Plaintiff assigned him GAF scores, mostly indicating that he had "moderate difficulty in social occupational, or social functioning." This informal assessment is too vague to allow the ALJ to make an informed decision on Plaintiff's capabilities. This is especially the case here where mental impairments are at issue. *See Sanchez*, 2015 WL 736102, at *7 (noting the necessity of obtaining treating physician's opinion where plaintiff suffers from long-term mental disorder because the "gravity and impact var[ies] by individual").

Moreover, the Commissioner's reliance on *Tankisi* and *Swiantek* does not cure this error. In both cases, the Second Circuit emphasized the extensiveness of each plaintiff's administrative records. In *Tankisi*, the Court noted that the medical record was "quite extensive" and that although it did not contain any formal opinions from the treating physician, it did include an

assessment of plaintiff's limitations from a treating physician. *Tankisi*, 521 F. App'x at 34. It also included a state consultative examiner's assessment. *Id.* In *Swiantek*, the Court also characterized the record as "extensive" and, relying on *Tankisi*, found the record to be sufficient because it included a psychiatric evaluation from a consultative psychologist who personally examined plaintiff and her complete medical history. *Swiantek*, 588 F. App'x at 84. The additional cases cited by the Commissioner where remand had been denied are similarly distinguishable. *See Johnson v. Colvin*, 669 F. App'x 44, 47 (2d Cir. 2016) (including in record a consultative psychiatric evaluation which stated that plaintiff had no limitations with respect to his ability to understand and follow simple directions and perform simple tasks); *Liang v. Comm. of Soc. Sec.*, No. 15 Civ. 7764 (HBP), 2017 WL 934715, at 5-6 (S.D.N.Y. Mar. 9, 2017) (including, at the request of SSA, a consultative examination of plaintiff and assessment by state agency psychologist in which both examiners found plaintiff to have only moderate limitations in her ability to understand and remember detailed instructions—even despite treating physician's assignment of a GAF score of 50). Though a question remains as to what a medical record must contain in order to be deemed complete for the purposes of the ALJ's RFC determination, what is clear from the caselaw is that *at least one* formal assessment of functionality by a medical professional—either treating or consultative—is required. The record in this case does not include any.

Second, the ALJ does not address the significance, if any, of the substantial changes reflected in the medical records. Although the ALJ characterized Plaintiff's condition as "controlled," it is clear from the records that Plaintiff continued to complain of the same symptoms with each visit—though there were some improvements—and that the doctors continued to change his prescriptions. In fact, during Plaintiff's May 28, 2014 visit with Dr. Lesniak, she discussed the possibility of adding medication to his regimen to further address his

18

ailments. The ALJ also relied on but did not note the change in GAF score reflected in the doctors' notes. In December 2012, Dr. Amols assigned Plaintiff a GAF score of 55. In May and June 2013, Dr. Berger assigned Plaintiff a higher GAF score of 65, but two months later, in August, Dr. Lesniak determined that his capabilities were better characterized with a score of 55.

Notwithstanding the fact that courts have questioned whether GAF scores actually provides a reliable basis for disability determinations, the change in Plaintiff's functioning in such a short time period, should have indicated to the ALJ that more information was needed to determine the effect of Plaintiff's mental impairments on his ability to function. *See Berry v. Comm'r of Soc. Sec.*, No. 14 Civ. 3977 (KPF), 2015 WL 4557374, at *3 (S.D.N.Y. July 29, 2015) ("The utility of this metric is debatable, particularly after its exclusion from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders."); *Mainella v. Colvin*, No. 13 Civ. 2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014) ("[T]he GAF score is not designed to predict outcomes, and the scores are so general that they are not useful without additional supporting description and detail.") (citing to Social Security Administration bulletin dated July 31, 2013, limiting use of GAF scores). Importantly, outside of Plaintiff's own reports and the letter submitted by Mr. Gibbings, there are no other notes regarding Plaintiff's ability to perform daily tasks and activities. Plaintiff claimed that he only went outside to attend hospital visits and go grocery shopping, which he had to do accompanied by his sister. Tr. at 237. He claimed that he could not go out alone because he sometimes forgot where he was. *Id.* Plaintiff also stated that he could not prepare food for himself, and that his sister woke him up and reminded him to take his medications. Tr. at 236–37. Plaintiff also has difficulty socializing and prefers to speak to people over the phone instead of in person. Tr. at 237, 243. Mr. Gibbings claimed that Plaintiff sometimes lost his balance and that he had trouble writing due to his hand tremors. Tr. at 888. There are no opinions from Plaintiff's doctors indicating whether his mental

impairments resulted in these functional drawbacks or how these impairments correlate with his ability to reenter the workforce.

Thus, the Court finds that the ALJ impermissibly relied on his own lay interpretation of the medical notes to determine Plaintiff's RFC. *See Hooper*, 199 F. Supp. 3d at 816 ("[T]he ALJ's own interpretation of the treatment notes does not supersede the need for a medical source to weigh in on [plaintiff's] functional limitations.") (citing *Ramos v. Colvin*, No. 13 Civ. 6503 (MWP), 2015 WL 925965, at *9 ("Although the RFC determination is an issue reserved for the Commissioner, where the medical findings in the record merely diagnose the claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities, as a general rule, the Commissioner may not make the connection himself.") (internal quotation marks omitted)). Accordingly, the ALJ's failure to obtain medical opinions constitutes clear error and demands remand.

## IV. CONCLUSION

For the aforementioned reasons, Plaintiff's cross-motion for judgment on the pleadings is GRANTED to the extent it seeks remand and the Commissioner's cross-motion for judgment on the pleadings is DENIED. The case is remanded to the Commissioner for further proceedings consistent with this opinion.

It is SO ORDERED.

Dated: August 15, 2017
New York, New York

Edgardo Ramos, U.S.D.J

20